Joel A. Kauth, CA Bar No. 186544
E-mail: joel.kauth@kppb.com
Mark Yeh, CA Bar No. 307181
E-mail: mark.yeh@kppb.com
KPPB LLP
2190 S. Towne Centre Place, Suite 300
Anaheim, CA 92806
PH:    (949) 852-0000
Fax:   (949) 852-0004

Attorneys for Plaintiffs Steve Neville,
Substructure Support, Inc., and
TDP Support, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| STEVE NEVILLE, SUBSTRUCTURE SUPPORT, INC., and TDP SUPPORT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> FOUNDATION CONSTRUCTORS, INC. and FOUNDATION PILE, INC. <br><br> Defendants. | Case No. 5:17-cv-02507-AG (AGRx) <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing Date:    August 19, 2019 <br> Hearing Time:    10:00 AM <br><br> HON. ANDREW J. GUILFORD <br><br> Place: RONALD REAGAN FEDERAL BUILDING AND UNITED STATES COURTHOUSE <br> 411 WEST 4TH STREET <br> SANTA ANA, CA 92701-4516 |

KPPB LLP

1

## <u>TABLE OF CONTENTS</u>

2   I.    INTRODUCTION ............................................................................1

3   II.   EXPERIMENTAL USE NEGATES PUBLIC USE OR SALE ....................3

4   III.  EQUITABLE ESTOPPEL DOES NOT APPLY, AND CANNOT APPLY

5   BEFORE A PATENT ISSUES .............................................................7

6   IV.   THE PATENTS-IN-SUIT ARE VALID ................................................12

7   V.    DEFENDANTS' EDTTEX PILES, USING EDTTEX TIPS ED1, ED2M

8   AND ED3, INFRINGE THE PATENTS-IN-SUIT .................................16

9   VI.   PLAINTIFFS ARE ENTITLED TO LOST PROFITS AND REASONABLE

10  ROYALTY DAMAGES GOING BACK SIX YEARS .......................................20

11  A.    Plaintiffs are Entitled to Lost Profits for Jobs They Would Have Obtained

12  but for Defendants' Infringement ....................................................21

13  VII.  CONCLUSION ..........................................................................25

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM IN OPPOSITION          i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.,*
    960 F.2d 1020 (Fed. Cir. 1992) ........................................................................10

*Aspex Eyewear Inc. v. Clariti Eyewear, Inc..,*
    605 F.3d 1305 (Fed. Cir. 2010) ...................................................................8, 9

*Barry v. Medtronic, Inc.,*
    914 F.3d 1310 (Fed. Cir. 2019) .........................................................3, 4, 5, 6, 7

*City of Elizabeth v. American Nicholson Pavement Co.,*
    97 U.S. 134 (1877) .........................................................................................5, 6

*Clock Spring, L.P. v. Wrapmaster, Inc.,*
    560 F.3d 1317 (Fed. Cir. 2009) ..........................................................................5

*Electromotive Div. of Gen. Motors Corp. v. Tranportation Sys. Div. of General Electric Co.,*
    417 F.3d 1203 (Fed. Cir. 2005) ..........................................................................5

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Products Group, LLC,*
    879 F.3d 1332 (Fed. Cir. 2018) ........................................................................23

*G. E. Hetrick & Assoc., Inc. v. Summit Const. & Maint. Co.,*
    11 Cal.App.4th 318 (Cal.App. 2 Dist.,1992).....................................................25

*Hemstreet v. Computer Entry Systems Corp.,*
    972 F.2d 1290  (Fed. Cir. 1992) ....................................................................9, 10

*In re Omeprazole Patent Litig.,*
    536 F.3d. 1361 (Fed. Cir. 2008) .........................................................................5

*Invitrogen Corp. v. Biocrest Mfg., L.P,*
    424 F.3d 1374 (Fed. Cir. 2005) ..........................................................................5

*Lucent Techs., Inc. v. Gateway, Inc.,*
    580 F.3d 1301 (Fed. Cir. 2009) ...................................................................22, 23

*Manville Sales Corp. v. Paramount Sys., Inc.*,

    917 F.2d 544 (Fed. Cir. 1990) ............................................................................. 6

*Meyers v. Asics Corp.*,

    974 F.2d 1304 (Fed. Cir. 1992) ..................................................................... 7, 10

*Meyers v. Brooks Shoe Inc.*,

    912 F.2d 1459 (Fed. Cir. 1990) ..................................................................... 9, 10

*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.*,

    36 Cal.4th 412 (Cal. 2005) ............................................................................... 25

*Panduit Corp. v. Stahlin Bros. Fibre Works*,

    575 F.2d 1152 (6th Cir.1978) ........................................................................... 22

*Paper Converting Mach. Co. v. Magna–Graphics Corp.*,

    745 F.2d 11 (Fed. Cir. 1984) ........................................................................... 21

*Pfaff v. Wells Elecs.*, Inc.,

    525 U.S. 55 (1998) ............................................................................................. 4

*Polara Eng'g Inc. v. Campbell Co.*,

    894 F.3d 1339 (Fed. Cir. 2018) ........................................................... 3, 4, 5, 6

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,

    566 F.3d 989 (Fed. Cir. 2009) ..................................................................... 14, 15

*SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*,

    137 S.Ct. 954 (2017)........................................................................................... 7

*Securus Techs., Inc. v. Glob. Tel\*Link Corp.*,

    701 F. App'x 971 (Fed. Cir. 2017) .......................................................14, 15, 19

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,

    883 F.2d 1573 (Fed. Cir. 1989) ...........................................................21, 22, 24

## Statutes

35 U.S.C. §286 ...................................................................................................... 20

35 U.S.C. § 102(b)............................................................................................. 5, 10

## I.   **INTRODUCTION**

Defendants' motion raises multiple issues, but fails to adequately support any single one of them.   Regarding infringement, Defendants are far from establishing a lack of infringement – the only element that they identify as purportedly missing from the accused device is taken not from the claim language, but a new element created by their expert.  This is not completely surprising, as the listing of materials considered for his report showed that he considered Defendants briefing on claim construction judgment, but not the Court's order on claim construction.  D.E. 55-3, Perko report at 10.  However, Dr. Perko's straw-man limitation of "a substantially flat plate termination" combines the limitation that the entire plate be "substantially flat," which was rejected during claim construction, with another unsupported limitation (not previously argued by Defendants) that the end plate be "at the termination of the pile tip."  D.E. 55-3, Perko report at 1, 2, 4; D.E. 51-6 Perko Decl. at ¶6(C), 8(F), 11. In reality, the entire end plate does not need to be substantially flat, and the end plate does not need to be "at the termination of the pile tip."  The relevant patent claims either require an end plate "having a substantially flat surface disposed perpendicular to the centerline," (`236 patent Claims 1, 19, 29, 32, 33; `708 patent Claim 29) or an end plate "closing the second end of the tapered portion" (`708 Claims 1, 31, 39).  Defendants appear to claim that the end plate of the accused instrumentalities is not "a substantially flat plate termination," (Dr. Perko's new limitation), but they do not actually address the claim language regarding "a substantially flat surface disposed perpendicular to the centerline of the tubular pile."  And they appear to concede infringement of the claims with an end plate "closing the second end of the tapered portion."

With respect to invalidity, such a claim must be proved by clear and convincing evidence.  This requires an element-by-element analysis of each claim asserted to be obvious.  Rather than address any claims, Defendants instead repeat their rejected claim construction arguments on disclaimer, but do not tie them to

validity.  Defendants broadly claim that certain references such as *Strabag* and *Moseley* have all the necessary limitations, but a closer look confirms that to be inaccurate.  Because they fail to identify any particular combination of prior art that purportedly renders each claim obvious, Defendants also fail to identify a motivation to combine, or an expectation of success.

With respect to the alleged time bar based on commercial use, Defendants have not addressed the standard for experimental use, and appear to be under the misconception that if a payment is received, a use can no longer be experimental.  However, receipt of payment does not make a use non-experimental.  As a challenge to validity, this claim must also must be proven by clear and convincing evidence.  Far from showing a public use or sale, the facts confirm that through September 2004 (months past the Benchmark job), Mr. Neville was still testing various configurations and prototypes of the invention, experimenting to determine if it would work for its intended purpose.  With the provisional filing date of March 2, 2005, the critical date is March 2, 2004.  Neville's experimental use continued until approximately September 2004, meaning that there was no statutory public use or invalidating sale of the invention before the critical date.

With respect to equitable estoppel, Defendants argue that a clock should start in 2009, when Neville first notified them of the publication of his patent application.  But no suit would have even been possible until the `236 patent issued in 2011, and the `708 patent did not issue until 2016, with the `362 following in 2017.  Equitable estoppel cannot arise before a patent issues, as there could be no misleading conduct regarding enforcement of a non-existent patent.  Neville did not threaten immediate, vigorous litigation or enforcement, but specifically noted that an amicable resolution might be possible, putting this in line with cases finding estoppel inapplicable.  Neville properly sought additional patent protection, and brought suit once his other patents issued, a timeline endorsed by the Federal Circuit in finding no estoppel.  Finally, defendants identify no misleading conduct

1 (only silence alone), and further offer no evidence of reliance or prejudice.

2      With respect to damages, Plaintiffs seek both lost profits and reasonable

3 royalty. This is standard in patent cases, as a reasonable royalty is the floor that

4 damages must not fall below. Plaintiffs do not seek damages for infringement

5 occurring more than 6 years prior to the filing of this suit, and only seek lost profits

6 where, but for Defendants' infringing offer for sale, Plaintiffs would have won the

7 bid and been awarded the job. It does not matter if Defendants' infringing bid was

8 the low bid – it was still an infringing bid. But for the infringing bid, Plaintiffs

9 would have been awarded the job. Defendants throw up a smoke screen, claiming

10 that Substructure did not have employees at times, or that its contracting license

11 had been administratively suspended, or that it lacked the right equipment. But

12 they offer no undisputed facts that Substructure could not have obtained the

13 necessary labor had it been awarded the job, just as it had done for jobs it

14 performed. And while lapses in paperwork led to a number of suspensions, all were

15 cured, and the license reinstated when Substructure performed jobs – exactly what

16 would have happened had Substructure been awarded one of the jobs won by

17 Foundation's infringing bids.

18 **II.**    **EXPERIMENTAL USE NEGATES PUBLIC USE OR SALE**

19      Foundation claims that the experimental use of a version of the invention on

20 the Benchmark Builders job presents an on-sale bar, as it was more than one year

21 before the filing date of the provisional patent application. D.E. 51-1 at 7. However,

22 the evidence confirms that this use was experimental, that the inventor was testing

23 claimed features of the invention, and had not yet determined which configuration

24 would work for the intended purpose. Declaration of Steve Neville in Support of

25 Opposition ("Neville Dec.") at ¶¶5-28; *Barry v. Medtronic, Inc.*, 914 F.3d 1310,

26 1328 (Fed. Cir. 2019) (Use of invention during surgery, for which doctor was

27 compensated, was not a public use where doctor performed checkup three months

28 later to confirm invention worked as intended.); *Polara Eng'g Inc. v. Campbell*

1   *Co.*, 894 F.3d 1339, 1348 (Fed. Cir. 2018) ("[A]n inventor who seeks to perfect his

2   discovery may conduct extensive testing without losing his right to obtain a patent

3   for his invention – even if such testing occurs in the public eye.")(quoting *Pfaff v.*

4   *Wells Elecs.*, Inc., 525 U.S. 55, 67 (1998)).

5       In *Barry*, the inventor Dr. Barry brought suit against a medical device

6   company for infringement.  The defendant claimed both a public use and on-sale

7   statutory bar.  The jury found infringement, and the district court denied JMOL and

8   upheld the verdict.  Defendant appealed to challenge the finding regarding public

9   use and on-sale bar.  *Barry*, 914 F.3d at 1316.  The invention was an improved tool

10  for installing spinal implants.  Dr. Barry used a version of the tool in three surgeries

11  in August and October 2003.  He had follow up appointments with the patients

12  from these surgeries between August 2003 and January 2004 to confirm that the

13  tool had properly adjusted the screws to in turn move the vertebrae.  It was only

14  after a follow up in January 2004 (a three-month follow up to the October 2003

15  surgery) that Dr. Barry "felt confident that his invention functioned for its intended

16  purpose and was ready to publicize it a professional forum." *Id*. at 1319.  He made

17  no changes to the invention.  He prepared a summary in February 2004 for

18  presentation at a July 2004 meeting.  He filed the patent application Dec. 30, 2004,

19  making Dec. 30, 2003 the critical date for purposes of the public-use and on-sale

20  bar issues 35 U.S.C. § 102(b). *Id*.

21      The *Barry* Court noted:  "The public use bar is triggered where, before the

22  critical date, the invention was in public use *and* ready for patenting." *Id*. at 1320

23  (emphasis in original)(quoting *Polara*, 894 F.3d at 1348 (Fed. Cir. 2018)).  The

24  Court found that the invention was not "ready for patenting" before the critical date,

25  and the only public use was an experimental use, which "serves as a negation of

26  the statutory bars." *Barry,* 914 F.3d at 1321 (citations omitted).  Foundation does

27  not even allege that the invention was "ready for patenting," much less make the

28  required showing. To show an invention is "ready for patenting," a challenger must

first show that the invention was reduced to practice, which requires a showing that 'the inventor 1) constructed an embodiment or performed a process that met all the limitations and (2) determined that the invention would work for its intended purpose.'" *Id*. at 1322 (quoting *In re Omeprazole Patent Litig.*, 536 F.3d. 1361, 1373 (Fed. Cir. 2008)).   As for public use, the Barry court noted:

> An inventor's use, while public in one sense, will not be considered a statutory public use if the use was experimental. *Electromotive*, 417 F.3d at 1211; *City of Elizabeth*, 97 U.S. at 134–35 ("The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as [a public] use.... [Testing an invention in a building even with the doors open] is not a public use, within the meaning of the statute, so long as the inventor is engaged, in good faith, in testing its operation. He may see cause to alter it and improve it, or not. His experiments will reveal the fact whether any and what alterations may be necessary."). "[I]n the context of a public use bar, evidence of experimental use may negate either the 'ready for patenting' or 'public use' prong." *Invitrogen*, 424 F.3d at 1379–80. "A use may be experimental if its purpose is: '(1) [to] test claimed features of the invention or (2) to determine whether an invention will work for its intended purpose—itself a requirement of patentability.' " *Polara*, 894 F.3d at 1348; see *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1327 (Fed. Cir. 2009).

*Barry*, 914 F.3d at 1328.

In the present case, the use of a version of the invention at the Benchmark Builders job was experimental.  Mr. Neville testified that he continued to test the invention afterwards at the Playa Vista site, and at the Fourth Street job.  Neville Dec. ¶¶11-28; Yeh Dec., Ex. A, 55:23-65:10; Dkt. No. 57-1 at 38-44 (47:5-53:19). A variety of additional prototypes and configurations were subsequently used. Neville Dec. ¶¶11-28; Yeh Dec., Ex. A, 55:23-65:10; Neville Dec., Exs. A, B, and C.  Once Neville confirmed the specific configuration that would work for its intended purpose, it was reduced to practice and ready for patenting.  This occurred in approximately September 2004.  Neville Dec. ¶28; Yeh Dec., Ex. A, 55:23-65:10.   Approximately 6 months later, Neville filed the provisional patent application.  Neville Dec. ¶28.  The fact that Neville was compensated on the Benchmark job does disqualify it as an experimental use.  *Barry*, 914 F.3d at 1329.

In *Barry*, the Court noted that others knew the use to be experimental, strengthening the testimony of Dr. Barry. *Id.* at 1328. In the present case, not only did Neville and Dial testify that the use at Benchmark was experimental, but this was confirmed in public documentation. Neville Dec. ¶8; Dkt. No. 57-1 at 38-44 (47:5-53:19), 52-62 (Depo Exhibit 105), and 46-51 (Depo Exhibit 45). Neville testified that he continued to experiment at the Playa Vista site in an attempt to perfect his invention for its intended use, as well as on the Fourth Street job, where the owner was also informed the system was experimental. Neville Dec. ¶¶12-21; Yeh Dec., Ex. A, 55:23-65:10; Neville Dec., Ex.'s A, B, C.

In *Polara*, the invention related to pedestrian signal systems, and was tested in prototypes satisfying the limitations of the asserted claims before the critical date. The public testing was done more than a year before the critical date (more than two years before the patent filing) with multiple revisions in two public intersections in Fullerton, California. Testing continued for over a year. The court confirmed the jury's finding of no public use, based on the use being experimental. *Polara*, 894 F.3d at 1344-1346, 1348-1349; *see also City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 133-34 (1877) (Testing durability of pavement for six years on public roadway is experimental use); *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 551 (Fed. Cir. 1990) ("When durability in an outdoor environment is inherent to the purpose of an invention, then further testing to determine the invention's ability to serve that purpose will not subject the invention to a section 102(b) bar.").

When an inventor is testing his invention, it is not subject to the 102(b) bar. It does not matter if the final version of the invention is similar, or even identical to an earlier tested version, as long as it was being tested. *Barry*, 914 F.3d at 1328 ("He may see cause to alter it and improve it, **or not**. His experiments will reveal the fact whether any and what alterations may be necessary.") (emphasis added). In *Barry*, the invention did not change from its use before the critical date, to the

confirming checkup three months later, but this qualified as experimentation. *Id.* at 1328, 1329.  In the present case, multiple variations and configurations of the invention were experimentally used for testing on the Benchmark job, at the Playa Vista site, and at the Fourth Street job.  Neville Dec. ¶¶11-28; Yeh Dec., Ex. A, 55:23-65:10; Neville Dec., Exs. A, B, and C.  The fact that the version of the invention reduced to practice was similar to a version used on the Benchmark job does not re-characterize the experimental use.

Foundation has not shown that the invention was "ready for patenting" at the Benchmark Builders job, and the facts show that Mr. Neville had not yet confirmed it would work for its intended purpose.

## III.  EQUITABLE ESTOPPEL DOES NOT APPLY, AND CANNOT APPLY BEFORE A PATENT ISSUES

Foundation claims a delay of over 8 years since the 2009 letter from Mr. Fitch regarding Neville's published patent application.  This is a new defense raised by Foundation for the first time in this motion, not plead in Foundation's answer, and never raised during discovery, precluding Plaintiffs from exploring the basis of this defense.  For that reason alone, this claim should be denied.  Foundation styles this late-added defense as "equitable estoppel," rather than laches, likely to get around the fact that the Supreme Court abrogated laches as a defense in patent cases in *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 137 S.Ct. 954 (2017).  However, Foundation effectively appears to only argue delay.  Foundation identifies no misleading conduct by plaintiffs (silence alone cannot be misleading), no detrimental reliance by Foundation, and no material prejudice to Foundation.

In addition, at the time of the 2009 letter, there were no patents issued that Plaintiffs could have enforced, so no equitable estoppel can apply. *Meyers v. Asics Corp.*, 974 F.2d 1304, 1309 (Fed. Cir. 1992).  Plaintiffs could not have threatened litigation with respect to any patent, or communicated acquiescence to any

enforceable right.  And Foundation was well aware that no patent had issued:  in the letter dated August 28, 2009, Foundation's attorney Rice stated: "Therefore, not only does you client not have an issues [sic] patent, it is highly doubtful the he will ever obtain one based on his present application."  D.E. 57-11 at 2.  And in his letter dated October 1, 2009, Foundation attorney Beverly added:  "Therefore, we believe it is unlikely that the application will issue as a patent, but we will continue to monitor the progress of the application with interest."  Declaration of Mark Yeh in Support of Opposition ("Yeh Dec."), Ex. F.  An informational letter regarding a pending patent application cannot form the basis for an equitable estoppel claim to a patent that issues years later, which could not have even been enforced at the time of the letter.

Outside of disparaging comments characterizing this action as a "freebie," "afterthought," "easy flyer," and "sidecar" (D.E. 51-1 at 8, 11), Foundation appears to rely solely on the *Akeso* case.  The first element of equitable estoppel described in Akeso is that "the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to its **patent**…."  *Id*. at 10 (emphasis added).  With no patent having issued at the time of the 2009 letter cited by Defendants, there can be no equitable estoppel.  In *Akeso*, the Court contrasted the Federal Circuit decisions in *Hemstreet* and *Aspex,* and the content of the demand letters in each.  In *Aspex*, there had been prior litigation between the parties, the patent had already issued, and there were two cease-and-desist letters demanding immediate cessation of sales.  *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.,* 605 F.3d 1305, 1308-1309 (Fed. Cir. 2010).  A three-year delay followed the last letter, and then a lawsuit.  Equitable estoppel was found.  *Id*.  In *Hemstreet*, the patent had also issued, and there was a letter offering to negotiate a license, followed by a six year delay.  The court noted that Hemstreet had been involved in other litigation during that time period, and had no patent to enforce for a time due to an erroneous unenforceability finding.  In finding no

estoppel, the Court noted that "Hemstreet's subsequent continued pursuit of his rights … left the attentive observer with little doubt of his intentions." *Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290, 1292-1294 (Fed. Cir. 1992). Additionally, the Court noted that a defendant must show that any actions it took "were in reliance upon supposed actions of [Plaintiffs], rather than a business judgment of its own….." *Id.* at 1294-1295.

In the *Akeso* case, the patent had also already issued.  A letter was sent demanding immediate cessation of sales and destruction of inventory.  A more than 10 year delay followed before suit was filed.  The Court noted that the letter in *Akeso* was of the more aggressive *Aspex* variety, demanding immediate stopping of sales, claiming infringement, and impliedly threatening litigation.

The Fitch letter referenced by Defendants is of the *Hemstreet* type. No patent had yet issued, so it could not and did not threaten vigorous and immediate enforcement.  It even specifically noted that Neville was open to an "amicable resolution," quite the opposite of an *Aspex*-type letter, or the letter in *Akeso* demanding cessation of sales and destruction of inventory.  D.E. 57-10 at 2-3.

Further, there was no 8-year delay.  The `236 patent did not issue until 2011, so no infringement action could have been brought prior.  Had Foundation actually monitored the progress as of the application, it would have seen the `236 patent issue in 2011, the `708 patent issue in 2016 and the `362 patent issue in 2017.  Such "subsequent continued pursuit of his rights" by Neville in acquiring additional patents would have "left the attentive observer with little doubt of his intentions" to enforce such patents.  See *Hemstreet*, 972 F.2d at 1292-1294.

Foundation improperly groups patents that issued in 2011, 2016, and 2017 and treats them as a single patent, claiming an 8 year delay, even though the suit was filed in 2017, six years after the issuance of the first patent, the year after the issuance of the second patent, and the same year as the issuance of the third patent. *See Meyers v. Brooks Shoe Inc.*, 912 F.2d 1459, 1462 (Fed. Cir. 1990)

("Nevertheless, we think the district court erred in basing its decision on a single laches period for all three patents, running from late 1982 or early 1983 to June of 1988.")  This same court noted it was reasonable for a patentee to wait and bring multiple related patents in a single suit.  *Id.* at 1462. In the present case, all three patents are related, and it was reasonable to bring suit after the third patent issued.

In the above-case, Meyers contacted Brooks in 1983, after his first patent had issued.  He filed suit against Brooks in 1988 after two additional patents had issued.  The court found no equitable estoppel, finding a failure of evidence supporting prejudice, noting Meyers' initial contact had no threat of immediate suit, and finding nothing misleading about Meyers' subsequent five-year silence.  *Id.* at 1460, 1463-64 ("All that aside, however, we do not believe that a suggestion of infringement coupled with an offer to license followed by silence would suffice to establish equitable estoppel.").

In another *Meyers* case, the Federal Circuit reversed a finding of equitable estoppel based on silence and a three year delay between a licensing offer and a lawsuit. *Meyers v. Asics*, 974 F.2d at 1309.  In that case, at the time of contact, only one of the three patents-in-suit had issued.  The Court found that there could be no equitable estoppel as to the two later-issued patents because there had been no contact since they had issued.  *Id.* at 1309.  Here, Foundation claims no contact by Plaintiffs since 2009, so there can be no equitable estoppel as to any of the patents-in-suit, since all issued after 2009.

Foundation does not identify any actions it took in reliance on Plaintiffs' purported misleading.  *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1042-43 (Fed. Cir. 1992) ("The accused infringer must show that, in fact, it substantially relied on the misleading conduct of the patentee in connection with taking some action.")  And Foundation fails to identify any material prejudice.  *Id.* at 1043 ("Finally, the accused infringer must establish that it would be materially prejudiced if the patentee is now permitted to proceed.")  The burden is on

Foundation to establish all elements. *Aukerman*, 960 F.2d at 1043.

Plaintiffs filed suit as soon as feasible. First, they had to wait until they had an issued patent. It was reasonable to wait to file suit until related patents issued. *Meyers v. Brooks*, 912 F.2d at 1462. Once the patents had issued in 2017, they were attempting to resolve state court litigation regarding ownership issues – filing earlier would likely have simply resulted in a stay of the case, as happened in the *Neville et al. v. Aldridge et al.* case. Due to their small size, it is difficult for Plaintiffs to fund multiple litigations at the same time. Plaintiffs filed suit in December 2017 accusing the EDTTEX system of infringement (not just the ED1). D.E. 1. Foundation unilaterally limited responses to the ED1 tip, claiming the other EDTTEX tip was the ED2 or Wedding Cake. Foundation did not respond fully to discovery with respect to the other members of the EDTTEX family. If they had, they would have produced detailed information regarding the ED2M and ED3 tips, clearly showing the welded-on helical flights. Foundation failed to provide full discovery with respect to tips beyond the ED1, and described ED2M and ED3 tips used on jobs as ED2 models. Foundation provided a chart in November 2018 claiming very few ED1 tips sold, and claiming that for nine jobs for which Plaintiffs believed they had used the infringing ED1 product, they had actually used the ED2 tip (Foundation marked those jobs as WC for wedding cake, and specifically defined WC as "Wed. cake part #ED2 Construction Supply FMODEX"). Yeh Dec., Ex. I, FCI-002805. However, for many of these jobs, Foundation actually used accused ED2M or ED3 tips according to its own 30(b)(6) witness. *See, e.g.*, D.E. 55-1 at 20-21 (191:17-193:16); Yeh Dec., Ex. I, 129:12-22, 134:3-9, 138:23-139:6, 228:6-14; 236:16-238:12. Plaintiffs discovered the use of the ED2M and ED3 through subpoenas to third-party geotechnical engineers, who provided pictures jobs showing these tips and clearly depicting the helical flights that distinguish them from the ED2.

## IV.    THE PATENTS-IN-SUIT ARE VALID

The patents-in-suit are presumed valid, and the burden is on Defendants to attempt to show invalidity by clear and convincing evidence.  Despite a clear ruling on claim construction rejecting Defendants' disclaimer arguments (D.E. 43 at 8-10), Defendants raise the argument again.  However, this time they propose a new construction for "end plate," different than what they unsuccessfully pushed for during claim construction, now claiming that in both the `708 and `236 patent, the end plate requires a "substantially flat plate at the termination of the pile tip."  D.E. 51-6 at ¶5(C).  Defendants argue that "[t]he patent claim history is very clear that absent the agreed limitation of a substantially flat end plate, the patent was going to continue to be rejected."  D.E. 51-1 at 14:16-17.  That is incorrect with respect to both the `236 and `708 patents.  No claim includes that limitation, and the specific language of the individual claims regarding features such as a conical or tapered section, a helical flight, and a particularly configured end plate are what distinguish these patents from the prior art.

Defendants cite to EP 0588143 *Strabag* (incorrectly identified as Stawbag – D.E. 51-1 at 12-13) showing Figures 1 and 2, claiming it has a "similar taper, helicals and flat plate."  D.E. 51-1 at 13.  However, this patent is not for a screw pile substructure support system, but instead is "related to an auger for producing a cast-in-place displacement pile."   Yeh Dec., Ex. F at 1; *Id*., Ex. J.  What Defendants fail to acknowledge is that to the extent there is an end plate in *Strabag* (which the patent refers to as a "detachable drill bit"), it has a "bottom inlet opening 26" in the center to allow liquid through.  *Id*. at 3-5. Because of this opening located along the centerline, the end plate had no "substantially flat surface disposed perpendicular to the centerline of the tubular pile" nor did it have an end plate "closing the second end of the tapered portion" as the end is not closed.  Since this portion was a "detachable drill bit," it was not fixedly attached, which was construed to mean "securely attached and not readily moveable or detachable."

1  D.E. 43 at 17.  In fact, what is shown in Figures 1 and 2 does not even contain a
2  pile as defined by the Court, which required that the pile "provide support as part
3  of the foundation.  *Id*. at 19. The tubular section 22 is a "cylindrical portion" of the
4  auger 10 that is removed after the tip is in place, so the tip is not attached to a
5  tubular pile, and cylindrical portion does not "provide support as part of the
6  foundation."  Yeh Dec., Ex. F at 4-5.   For *Strabag*, and the few other references
7  cited by Defendants, they fail to identify on an element-by-element basis where
8  each limitation is found in the prior art.

9        While Defendants also claim that the *Moseley* patent disclosed a "flat plate,"
10  (D.E. 51-1 at 17), they do not identify where they believe such plate exists in
11  *Moseley*.  What *Moseley* actually discloses is a "pilot P" that "is passed down first
12  separately from the pile, on the point of the center-pin to its correct position and
13  there deposited.  The pile is then sent down by the aid of, and over the center-pin,
14  until the orifice *o* in its lower end passes the handle or shank Q of the pilot…."
15  D.E. 51-6 at 75.  What that means is that in *Moseley*, the "pile" is hollow, and is
16  dropped down over the "handle or shank Q of the pilot."  With the orifice o on the
17  centerline as shown in the figures, *Moseley* does not have an end plate "having a
18  substantially flat surface perpendicular to the centerline" – instead it has a hole
19  ("orifice o") along the centerline.  This also means that *Moseley* does not have an
20  end plate "closing the second end of the tapered portion" – the end of the tapered
21  portion is open, ending in orifice o.  This is indicative of Defendants' superficial
22  and misleading analysis, where they claim many elements are present, but the
23  references themselves refute the argument.  Other than the broad and incorrect
24  assertion that "both Moseley and Stawbag [sic] have a flat plate," there appears to
25  be no other discussion of where the elements of any of the patent claims can be
26  found in prior art references.

27        For obviousness, Defendants must first come forward with a specific
28  combination of prior art references that collectively teach every limitation in each

asserted claim.  They must address the scope and content of the prior art, the differences between the claims and the prior art, the level of ordinary skill in the art, and secondary considerations such as commercial success and long-felt need. *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) ("The Supreme Court has explained that the Federal Circuit's 'teaching, suggestion or motivation' test provides helpful insight into the obviousness question as long as it is not applied rigidly."); *Securus Techs., Inc. v. Glob. Tel*Link Corp.*, 701 F. App'x 971, 976 (Fed. Cir. 2017) ("Importantly, 'it is not enough to simply show that the [prior art] references disclose the claim limitations; in addition, "it can be important to identify a reason that would have prompted [the skilled artisan] to combine the elements as the new invention does."'").   The *Securus* court noted that the motivation to combine is a question of fact, meaning that Defendants' failure to identify any motion to combine at all raises an issue of fact, and summary judgment cannot be granted. *See id*. Defendants must show a reason that one of skill in the art would have looked to combine such references, addressing factors such as the references teaching away from one another, or not being compatible to be combined.  *Procter & Gamble Co. v. Teva,* 566 F.3d at 994 ("A party seeking to invalidate a patent based on obviousness must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'") Even identifying specific combinations of references, and noting they are in the same field, is not enough to show obviousness, even under a preponderance of evidence standard in *Inter Partes Review*.  *Securus*, 701 F. App'x at 976. Here, the evidentiary standard is "clear and convincing," and Defendants have not identified any specific prior art combinations, and thus, do not offer even a conclusory motivation to combine.

   While Plaintiffs' expert submitted a rebuttal report on validity addressing the

incompatibility of certain combinations, and the teaching away in certain references, Plaintiffs did not submit a declaration from Dr. Decker with this opposition, because in the absence of any combinations set forth by Defendants, Plaintiffs would have to attempt to prove the negative, and construct the myriad of possible combinations of the reference excerpts attached to the Perko declaration, only then to address each combination and show why it is not viable.  This Court's S.P.R. 2.5.2 requires Defendants to specifically identify obviousness combinations in their invalidity contentions, and the cases cited above require such specificity as well.

Using *Strabag* as an example, as it is the main reference addressed in Defendants' brief, they do not explain why a person of ordinary skill in the art attempting to improve a screw pile foundation system would look to a reference for an auger with a detachable drill bit for forming cast in place piles.  Notwithstanding that the components of Strabag do not actually meet the claim limitations, Defendants do not explain why there would be a likelihood of success in combining a removable auger for drilling holes that are later filled with concrete, with a pile and tip that remain in the ground and provide support as part of the foundation. They do not identify any specific combinations of prior art references that disclose every limitation of any claim.  And they do not identify what reference *Strabag* could be combined with to satisfy the limitations of any claim, much less addressing each element of all of the asserted claims.

At page 15 of their brief, Defendants purport to quote the file history, but instead change the quote. Defendants state the language was "wherein the pile tip **is** substantially flat …" but the actual language is "wherein the pile tip **has a surface that is** substantially flat …"  File History of U.S. Pat. No. 7,914,236, previously lodged with Court, 09/15/2008 Response to Non-Final Office Action at 8 (quoting language of claim 17, which was later cancelled) (emphasis added).  The actual language of the response does not support Defendants argument.

The patents are presumed valid over the prior art cited by the Examiner, and while rehashing the file history, Defendants do not identify any reference cited by the Examiner that includes all the limitations of any asserted claim.  Defendants spend the majority of the invalidity portion of their brief arguing disclaimer, but fail to actually put forth any invalidity arguments based on obviousness.  Not a single obviousness combination was found in the brief.  Dr. Perko's report and declaration similarly fails to identify any particular obviousness combinations, fails to identify any motivation to combine any specific references, and fails to demonstrate a likelihood of success of any particular combination.  And like the superficial comparison to the Figures from EP 0588143 *Strabag*, his analysis fails to identify specifically in any reference where particular claim elements are found.

During claim construction, the Court noted in its order that "Defendants have not shown disclaimer as to the claims in these other patents on the current record." D.E. 43 at 10.  Defendants have added nothing to the record here to further such argument.  Defendants have failed to meet their burden, and have not proven invalidity of any claim of the patents-in-suit.  Defendants have failed to make out a prima facie case, and have not addressed secondary considerations such as commercial success, long felt need, skepticism by others, and unexpected results, which all support a finding of nonobviousness.  Neville Dec. ¶¶ 37, 41, 75.

## V.    **DEFENDANTS' EDTTEX PILES, USING EDTTEX TIPS ED1, ED2M AND ED3, INFRINGE THE PATENTS-IN-SUIT**

Defendants' ED1, ED2M, and ED3 EDTTEX tips infringe the `236 and `708 patents. D.E. 53-1. Plaintiffs have demonstrated that each element of each asserted claim is found in the accused devices, or practiced in the accused methods. Defendants appear to only dispute the presence of a single element but it is an element of their own making, rather than one taken from any claim.

Presumably using the hindsight benefit of information provided during a meet and confer in which Plaintiffs explained the basis for their anticipated Daubert

motion with respect to Dr. Perko's previous expert report (in which Dr. Perko did not consider the Court's Claim Construction Order D.E. 43, and ignored the language of the claims in favor of his own, newly-created limitation), Dr. Perko in his declaration now goes beyond the scope of his prior report, referencing actual claim limitations of a select few claims.  He goes further to state that the omission of the actual claim limitations from his expert report was "shorthand," and that his nomenclature "the substantially flat plate" "means the same thing" as the actual claim language of Claims 12 and 19 of the `236 patent.  (The language of Claims 12 and 19 still does not align with Dr. Perko's declaration, as Claim 19 does not include the language "an end plate disposed at the second pile tip end" as Dr. Perko purports to quote, and claim 12 is a dependent claim in the `236 patent).  D.E. 51-6, Perko Decl. at ¶5(C).  In addition, this "shorthand" approach is sufficient reason to discard Dr. Perko's declaration, as a proper non-infringement analysis must show the absence of an actual claim limitation.  While Dr. Perko claims his "shorthand" approach addresses the actual language of Claims 12 and 19 of the `236 patent (which is incorrect), he does not appear to even attempt to address the language of the remaining claims of the `236 patent, or the claims of the `708 patent.

Defendants argue that the ED1 has a "different shape." D.E. 51-1 at 18.  This is not a plausible noninfringement argument, and does not address the language of any claim.  As noted in Plaintiffs' motion, Defendants admitted many of the features of the accused devices, including the conical section, an end plate, and helical flights. D.E. 53-1; D.E. 56-1 at ¶¶33-44.  Having admitted these facts, rather than compare the ED1 to the language of any claim, Defendants make the irrelevant comparison between Mr. Neville's commercial embodiment and the ED1, citing the testimony of the salesman who sold Foundation the infringing ED1 tips, and admitted he had never read the patents on the pile tip (and couldn't understand the other). Yeh Dec., Ex. D, 177:13-178:13.  With respect to the ED1 tip, Dr. Perko's

declaration addresses only the language of what he refers to as Claims 12 and 19 of the patent, and ignores asserted claims 1, 2, 4, 6-9, 16-18, 29, 30, 32 and 33. D.E. 51-6 at ¶6.  It also ignores all claims of the '708 patent.

Without any actual support, and without addressing the language of a single claim, Defendants also argue "The claims in `236 and `708 require a substantially flat end plate, and a gradual tapered section between the end plate and the tubular pile." D.E. 51-1 at 20.  The supporting citation is to the entirety of the `236 patent. There is no discussion of the language of any particular claim, or how such language could support such a reading, despite the court's specific rejection of this interpretation during claim construction.  D.E. 43 at 9-10.  The claims of the `236 patent include the language "end plate having a substantially flat surface disposed perpendicular to the centerline" but the Court previously determined that this did not mean the entire end plate need be substantially flat.  *Id*. at 10 ("Defendants' argument would only apply if the end plate was required to be perpendicular to the centerline along the entire width of the end plate. Defendants are not arguing for such a limitation and such a limitation is not found in the claims or specification."). Only a surface of the end plate, positioned properly, and not the entirety of the end plate, need be substantially flat to satisfy the limitation "end plate having **a substantially flat surface** disposed perpendicular to the centerline."   Finally, Defendants do not even attempt to argue why such a limitation would apply to the claims of the `708 patent that have the "end plate closing the second end" language (all but claim 29) and do not include the "substantially flat surface" or "perpendicular" language.  This argument was also previously rejected during claim construction.  *Id*. at 9-10.

With respect to the ED2M and ED3, without identifying any applicable claims, Foundation argues that they have no taper, despite referring to them internally as a "stepped taper," and the taper being visible.  D.E.55-1 at 40-41; D.E. 54, Decker Dec. ¶¶ 47-48.  However, Foundation's expert admits they are tapered.

D.E. 51-6 ¶7(A) and p. 56 (referring to "stepped tapered spiral") and incorporated that in its brief. D.E. 51-1 at 17. They also argue that the ED2M and ED3 have no "flat plate" (not a claim limitation). D.E. 51-1 at 20. They do not appear to dispute that the ED2M tips have an end plate with a substantially flat surface perpendicular to the centerline, nor do they dispute that the ED2M and ED3 have an end plate "closing the second end of the tapered portion."   Other arguments made by Foundation appear to relate to a comparison with Neville's commercial embodiment, and not the patents-in-suit, as Foundation argues that "[i]nstead of two helicals (Neville's patent), that do not run the length of the tapered section, the FCI EDTTEX 2M and 3 stepped or wedding cake tip, has a single spiral that has a fin like helical, and is continuous." D.E. 51-1 at 20. However, Mr. Williams in fact testified that the ED2M and ED3 each have two helicals of differing sizes welded to them. D.E. 55-1 at 7-8 (44:6-16, 47:18-25). With respect to the ED2M and ED3, Perko's declaration does not address the ED2M, only the ED2. D.E. 51-6 at ¶7. While admitting the ED2 and ED3 are "tapered," he attempts to distinguish these tips based on limitations not present in the asserted claims, such as whether they are cast or constructed of "rolled sheet steel metal." *Id*. Of course, the patents-in-suit contemplate that the pile tips can be cast. D.E. 54 Decker Dec. ¶7; D.E. 54-3 at 4:53-59; D.E. 54-4 at 3:50-56 ("Those skilled in steel fabrication will understand that numerous alternatives are available for the fabrication of the pile tip 10 and the assembly of the pile tip 10 and the pile 1 without deviating from the principles of the invention described herein. For example, the pile tip 10 could be cast as a single unit rather than hand fabricated from separate pieces of steel stock.")  The remainder of paragraph 7 attempts to distinguish the ED2 and ED3 based on terms not found in the claims, such as "gradual taper," and "tapered section terminating in an end plate" in 7A; and flat, rolled sheet steel metal," "not cast nor stepped" and "flat sheet of metal" in 7C. The accused instrumentalities must be compared to the patent claims, not to a commercial embodiment.

1    Williams' declaration is also deficient, discussing limitations not present in
2    any claim, comparing accused products to commercial embodiments rather than
3    claim limitations, or comparing Defendants' patents to Plaintiffs' asserted patents.

4    Rather than create or import new limitations, a proper noninfringement
5    analysis would identify at least one element in each asserted claim that is not
6    present in the accused instrumentality or method.  Dr. Perko fails to do this. When
7    assessing infringement, one cannot simply discard the claim language, or ignore
8    the court's claim construction ruling that explicitly found that not all claims were
9    limited to an end plate having a substantially flat surface disposed perpendicular to
10   the centerline (see all `708 claims except 29), and that even in those claims
11   containing such language, the entire width of the end plate did not have to be
12   substantially flat – only enough so that it could have "a substantially flat surface
13   disposed perpendicular to the centerline of the tubular pile."

14   Dr. Perko does not explain in his report, or his declaration, where his
15   additional limitation "at the termination of the pile tip" comes from.  He ignores
16   the claims which describe, *inter alia*, a protrusion, point shaft or cutter tooth
17   extending beyond the end plate, or the embodiments described in the patents where
18   the end plate is not "at the termination of the pile tip."  In addition, this is a
19   completely new limitation put forth by Foundation, which they waived by failing
20   to raise at claim construction, and for which they offer no support.

21   Defendants argue that Neville stated that he did not contend ED2 and ED3
22   to be infringing, but the cited deposition testimony only discusses the ED2, which
23   is not surprising since Plaintiffs do not contend that ED2 infringes.  To be clear,
24   Plaintiffs contend that as used, EDTTEX ED1, ED2M, and ED3 infringe.

## VI.   PLAINTIFFS ARE ENTITLED TO LOST PROFITS AND REASONABLE ROYALTY DAMAGES GOING BACK SIX YEARS

27   Pursuant to 35 U.S.C. §286, Plaintiffs seek damages for infringement
28   occurring on or after December 18, 2011, which is six years prior to the filing of

1  this action.  For that reason, Defendants' request for such a limitation is moot.

2  However, the sales numbers recited by Defendants are incorrect.  Mr. Williams

3  admitted to use of an additional 102 accused ED1 tips in February 2012 (Yeh Dec.,

4  Ex. I, 217:4-218:12), and Defendants' recitation of the number of tips does not

5  include either the ED2M or the ED3 tips used, offered for sale or sold since

6  December 18, 2011 (Plaintiffs best estimate is approximately 2000 tips).  Plaintiffs

7  are still awaiting updated sales figures for such tips, and are concurrently filing a

8  motion to compel to obtain profit data for jobs on which Defendants utilized the

9  accused instrumentalities since Dec. 11, 2011.

10  **A. Plaintiffs are Entitled to Lost Profits for Jobs They Would Have**

11  **Obtained but for Defendants' Infringement**

12  Upon proving infringement, Plaintiffs are entitled to damages sufficient to

13  compensate them for their loss.  This can include both reasonable royalty and lost

14  profits.  *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir.

15  1989)("The measure of damages is an amount which will compensate the patent

16  owner for the pecuniary loss sustained because of the infringement.  But the floor

17  for a damage award is no less than a reasonable royalty, and the award may be split

18  between lost profits as actual damages to the extent they are proven and a

19  reasonable royalty for the remainder.")(citations omitted).

20  Lost profits need not be proven by certainty, but by reasonable probability.

21  *Id*. at 1577 ("patent holder does not need to negate all possibilities that a purchaser

22  might have bought a different product or might have foregone the purchase

23  altogether.") (quoting *Paper Converting Mach. Co. v. Magna–Graphics Corp.*, 745

24  F.2d 11, 21 (Fed. Cir. 1984)).  The most common way of addressing lost profits is

25  by application of the *Panduit* factors:  "(1) demand for the patented product, (2)

26  absence of acceptable noninfringing substitutes, (3) his manufacturing and

27  marketing capability to exploit the demand, and (4) the amount of the profit he

28  would have made." *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152,

1156 (6th Cir.1978); *see also State Indus.*, 883 F.2d at 1577.  "To get lost profits as actual damages, the patent owner must demonstrate that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales." *Id.*  In their brief, Defendants do not cite to the Panduit factors, and instead cite to *Georgia-Pacific*, a case more commonly used in connection with determination of a reasonable royalty.  D.E. 51-1 at 21.  However, it appears that Defendants' arguments all go to the third *Panduit* factor:  whether Plaintiffs, and more particularly Substructure Support, could have exploited the demand and performed the jobs.  Because Defendants have not yet produced all documents relating to sales and use of the accused products, Plaintiffs believe that there are likely additional jobs on which the accused products were used where Plaintiffs and Defendants bid head to head.  However, for the purposes of Defendants' motion, Plaintiffs address the eight jobs for which Defendants seek a ruling that lost profits are not available. However, Defendants are mixing lost profits and reasonable royalties.  The claims at issue include method claims that cover the installation of the piles, including attaching the tips to the piles, attaching a drill rig to the pile and turning the pile to install it into the ground.  *See, e.g.*, `236 patent at claim 33; `708 patent at claim 31. Defendants argue that "Since Plaintiff is claiming a component part of a service – a pile tip as part of a overall construction project, it must show the demand for the job and driver of the subcontract work is the pile tip."  D.E. 51-1 at 21.  At page 22, it cites the *Lucent* case for this proposition.  However, *Lucent* is not a lost profits case.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) ("**Lost profits are not at issue in the present case**.") (emphasis added).  Lucent is a reasonable royalty case dealing with apportionment, and the application of the *Georgia-Pacific* factors.  The patent covered a date-picker function, and the accused product was Microsoft Outlook – the date-picker function is one of thousands of non-infringing features of Outlook, and thus when determining how to apportion "profit" from the sale of the accused device (not "**lost profits**,")  in a

hypothetical negotiation approach to determining a reasonable royalty (where an appropriate royalty would split such profit between the parties), some apportionment was necessary to properly allocate that profit related to the patented features.  *Id*. at 1325, 1333[1].  Furthermore, while defendants have some claims that cover the tips attached to a pile, they also have method claims noted above that cover attaching the tip to a pile, attaching a drill rig to the pile, positioning the pile, and turning the pile to install it into the ground.  Plaintiff is not "claiming the pile tip as part of a overall construction project;" it is claiming the method of installing the piles as claimed in the patent.  With respect to a reasonable royalty, the proper royalty base is not just the tip, but that portion of the job relating to installing the pile, including the tip, pile, drill rig and necessary labor to perform the patented methods.  *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Products Group, LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) ("Using the accused lawn mower sales as the royalty base is particularly appropriate in this case because the asserted claim is, in fact, directed to the lawn mower as a whole.  It is not the baffle that infringes the claim, but rather the entire accused mower. Thus, claim 1 covers the infringing product as whole, not a single component of a multi-component product.").  However, that is for another day, as Defendants' motion seeks only to limit Plaintiffs' lost profits claim.  Defendants have not provided a case showing such apportionment calculations apply to lost profits, because they do not apply.

Next, Defendants appear to argue that Plaintiffs can only claim lost profits on jobs for which they were the low bidder.  The jobs on which Plaintiffs seek lost profits required particular types of screw piles – sometimes calling them out by Plaintiffs' trademarked Torque Down® designation, other times using a generic designation such as twisted, or twist in place piles.  Defendants did not bid a non-

---

[1] Ironically, Plaintiffs previously provided the *Lucent* case to Defendants as part of the meet and confer process, to show that job profits are relevant to the determination of a reasonable royalty, because Defendants refuse to provide the profit data for the jobs on which the accused products were used, installed by the claimed method.  Such matter is going before the magistrate in a concurrently filed motion to compel.

infringing product, but instead bid using one of the infringing EDTTEX piles (ED1, ED2M or ED3).   Defendants bid was an infringing offer for sale, and its performance constituted infringement as well.   But for Defendants' infringement (including its infringing offer for sale), Plaintiffs would have obtained these jobs. Neville Dec. ¶¶54-75.   Because Defendants were bidding using the infringing products, it did not matter if their bid was high or low – it was infringing. Plaintiffs need only show "a reasonable probability that, but for the infringement, it would have made the infringer's sales." *State Indus.*, 883 F.2d at 1577.   Plaintiff does not seek lost profits on jobs where Defendants were low bidder using a non-infringing alternative.   They only seek lost profits on those jobs where Defendants bid an infringing system.   If Foundation's infringing bid had not been made, Plaintiffs would have obtained the job.   Neville Dec. ¶¶54-75.   Defendants do not deny that on each of these jobs, they bid one of the accused EDTTEX systems.   Instead, they contend that they were awarded the job for other reasons.   However, that is speculation, and not relevant to lost profits, because in the absence of their infringing bid, they would not have obtained the job.   Defendants implicitly admit that they bid using the accused systems because such pile tips were required by the job specification, and do not contend that they could have obtained the bid using a non-infringing alternative.   They claim equipment limitations (which Plaintiffs dispute), or administration issues with Substructure's contracting license. However, during this time period, Substructure performed numerous jobs.   Neville Dec. ¶¶37, 54-57.   While it did not carry employees when it did not have jobs to perform, and was sometimes slow in completing the necessary paperwork, Substructure was always successful in getting its license paperwork current so that it could perform jobs.   Neville Dec. ¶¶48-54.   Had it needed to obtain employees for any job, it could have done so.   Neville Dec. ¶49.   Other purported evidence provided by Defendants are statements from third parties regarding the job. However, all of these statements are in regard to the award of the bid as between

Substructure and Foundation.  Foundation presents no evidence that had their bid been removed, Substructure still would not have received the job.

Defendants also claim that Plaintiffs had a "sham RMO" for their contractor's license prior to May 2012.  Plaintiffs dispute this as well.  Neville Dec. ¶¶44-45.  Defendant's expert also misstates the law (D.E. 51-5 at ¶8), as an RMO does not need to perform all such activities, and an RMO who is only "managing construction activities by making technical and administrative decisions," and never visits a site could still be proper.  *G. E. Hetrick & Assoc., Inc. v. Summit Const. & Maint. Co.,* 11 Cal.App.4th 318, 329-330 (Cal.App. 2 Dist.,1992).  While this appears to affect only a single job, Defendant's expert Berrigan attempts to extrapolate this out to cover numerous other jobs.  The final attack by Defendants appears to be that Substructure could not have bid, and could not have been paid for a job, even its license was suspended for one day during the job.  That is a broad overstatement of the law, and completely ignores the substantial compliance provisions, where jobs can be bid, performed and payments received if the contractor remedies the defect.  *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.*, 36 Cal.4th 412, 433-37 (Cal. 2005).  In its conclusion on lost profits, Foundation again goes back to the *Lucent* reasonable royalty case, arguing for a new requirement that lost profits be apportioned. D.E. 51-1 at 25. That is not the law. *Lucent* states explicitly that lost profits were not at issue in that case, and there is no basis for Defendants' purported requirement that Plaintiffs show that the incremental price of the tips drove demand. Plaintiffs need only show a reasonable probability that but for the infringing bid, they would have obtained the job.  Defendants have applied the wrong law, and factual issues abound. Plaintiffs' lost profits should not be limited on that basis.

## VII.  <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion should be denied. Defendants have not carried their burden, and genuine factual issues remain.

1   Dated:  July 29, 2019                    Respectfully submitted,

2                                            KPPB LLP

3                                            By: /s/ Mark Yeh

4                                                Joel A. Kauth
                                                 Mark Yeh
5                                            Attorneys for Plaintiffs Steve Neville,
6                                            Substructure Support, Inc., and TDP
                                             Support, Inc.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KPPB LLP   Plaintiffs' Memorandum in Opposition

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the following documents has been served upon all counsel of record on July 29, 2019, via the Court's ECF Filing System:

- Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment
- Declaration of Steve Neville in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgement
- Declaration of Mark Yeh in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment
- Plaintiffs' Statement of Genuine Disputes of Material Fact in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgement
- Plaintiffs' Evidentiary Objections to Defendants' Supporting Declarations

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 29, 2019, at Anaheim, California.


By: /s/ Mark Yeh
    Mark Yeh